FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

JUN 10 2002

[signature]
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

EDDIE SANDOVAL,

    Plaintiff,

vs.    Civil No. 00-1056-WJ/LCS-ACE

UNITED STATES OF AMERICA,
DON WEAVER, JR., and
RAUL GUARDADO

    Defendants.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT FILED BY DEFENDANTS DON WEAVER, JR., RAUL GUARDADO AND TIMOTHY RHODES

THIS MATTER comes before the Court on the Motion for Summary Judgment based upon qualified immunity filed by Defendants Don Weaver, Jr., Raul Guardado, and Timothy Rhodes (Doc. 45) filed on December 21, 2001. Having considered the pleadings of record, and having heard the parties on May 22, 2002, the Motion is granted. The Court notes that Defendant Rhodes has already been dismissed from this action with prejudice per the Stipulation of Dismissal filed on February 11, 2002 (Doc. 96), and that the caption was modified at that time so as not to include Defendant Rhodes.

### FINDINGS OF FACT.

For its findings of fact, the Court incorporates Exhibit B to the Reply memorandum filed by Defendants Weaver and Guardado (Exhibit B to Doc. 74).

    1.    On May 17, 1998, Plaintiff was a teenager traveling on a Greyhound bus from El Paso to Albuquerque.

    2.    Plaintiff entered the United States at El Paso.



3. At the Border Patrol fixed checkpoint on I-25 north of Las Cruces, at about 2:00 am Border Patrol Agent Weaver boarded the Greyhound bus to conduct a citizenship check of some passengers.

4. Agent Weaver cannot recall the exact exchange with Plaintiff that led to the request that Plaintiff step off the bus. Agent Weaver cannot recall Plaintiff's demeanor or how Plaintiff answered the questions posed to him.

5. Physical force was not used to get Plaintiff to step off the bus.

6. When there are questions about a commercial bus passenger's citizenship at a fixed checkpoint, the Border Patrol routinely asks the passenger to get off the bus and come into the checkpoint for further questioning to avoid embarrassment for the passenger and to ensure the safety of the other passengers and the Border Patrol Agents involved.

7. Plaintiff was not handcuffed.

8. Agent Weaver ordered Plaintiff to exit the bus and escorted Plaintiff into the checkpoint trailer for further questioning.

9. Inside the checkpoint trailer was Border Patrol Agent Raul Guardado, Agent Weaver's field training officer, and a more fluent Spanish-speaker.

10. Agent Weaver asked Agent Guardado to assist with the questioning of Plaintiff.

11. Agent Guardado asked Plaintiff what his citizenship was, in English, perhaps more than once.

12. Plaintiff did not answer Agent Guardado but avoided eye contact, looked at the wall, and blinked a lot.

13. Agent Guardado asked Plaintiff of what country he was a citizen, in Spanish, again

perhaps more than once.

14. Plaintiff was informed that he was in the United States illegally and would have to return to Mexico.

15. Plaintiff accepted a voluntary return to Mexico and chose not to appear before a judge.

16. Plaintiff signed the Form I-215B (his affidavit), and Agent Weaver and Agent Guardado also signed at the bottom as witnesses.

17. Since Plaintiff had admitted that his real name was "Eric," if he had signed the forms as "Eddie," the Agents would have asked him to sign a new set as "Eric," but neither Agent recalls tearing up any documents that Plaintiff signed.

18. Agent Weaver put Plaintiff in a holding cell at the checkpoint trailer as was customary until the Border Patrol bus from El Paso could pick him up.

19. The usual practice for the Agents would be to offer food and drink to a person who was put into a holding cell. Neither Agent can recall offering Plaintiff food or drink when he was placed in the cell, but if Plaintiff had at any time said that he was hungry or thirsty, they or one of the other Agents would have offered Plaintiff the food and drink that were available then at the checkpoint specifically for such purposes: frozen burritos that could be microwaved, granola bars, juice, and water.

20. Plaintiff was still in the holding cell when Agents Weaver and Guardado went off duty at 7 am. He was picked up by the Border Patrol bus and taken to El Paso after their shift was over.

21. The Border Patrol would not have returned to Plaintiff the documents that were part

of his identification as "Eddie".

22. Agent Guardado told someone on the incoming day shift that when Plaintiff was picked up by the Border Patrol bus from El Paso to return to Plaintiff the rest of the documents that were not used for Plaintiff's identification.

23. Plaintiff was transferred to another holding cell by another Agent after he thought the shift had changed, and he was not in the second cell for very long before he was transported to El Paso.

24. Plaintiff walked from El Paso to Juarez, took a local bus and a taxi to get to the bus depot, bought a ticket and took a bus home to Chihuahua, since buses from Juarez to Chihuahua run every hour. Upon his arrival in Chihuahua he took a taxi home to his mother.

25. On May 17, 1998, there was confusion as to Plaintiff's name and identity amongst the three documents that Plaintiff possessed to show his identity (birth certificate, baptism certificate, and social security card).

26. The affidavit that Plaintiff signed on May 17, 1998, states: "My true and correct name is Eric de Jesus Dominguez-Sandoval...."

27. Plaintiff's birth certificate states his first name is Eddie, and the certificate was registered in 1984.

28. Plaintiff's baptism certificate dated in August 1982 states his first name is Eric.

29. Plaintiff's social security card states his first name is Eddie.

30. Post-incident, Plaintiff obtained a U.S. passport.

31. Post-incident, Plaintiff obtained a baptism certificate with the first name of Eddie.

32. It is common for the Border Patrol to catch people using false or counterfeit

4

documents, or imposters using other people's identification. Such false or counterfeit documents, or documents used by imposters, are kept by the Border Patrol.

33. In his thirty years of Border Patrol experience, Agent Rhodes has never seen or known of an Agent to physically drag someone off of a commercial bus.

34. Plaintiff was not handcuffed since a juvenile would not normally be handcuffed in this type of situation.

35. In May of 1998 the Border Patrol Agents acted in accordance with Plaintiff's own admission that he was not a U.S. citizen.

**CONCLUSIONS OF LAW.**

The constitutional violation that was identified by the plaintiff was a violation of the plaintiff's Fourth Amendment right to be free from unreasonable search and seizure. During argument on May 22, 2002, there were issues addressed to Fifth Amendment and Privileges and Immunities Clause, but they were not covered in the plaintiff's response to the summary judgment, so I will not consider them. I will treat the constitutional violation that was complained of by the plaintiff as a Fourth Amendment violation.

1. Federal officials are subject to suit in their individual capacities and are personally liable for monetary damages for alleged violations of federal constitutional rights in the course of their federal employment.

2. In the words of the United States Supreme Court, the affirmative defense of qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.

3. The qualified immunity privilege is an immunity from suit as opposed to, or rather than, a mere defense to liability.

4.  Qualified immunity shields federal officials from liability insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

5.  In determining whether the right was clearly established, the Court assesses the objective and legal reasonableness of the action at the time of the alleged violation and asks whether the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violates that right.

6.  Once a defendant asserts the affirmative defense of qualified immunity, the burden then shifts to the plaintiff to first establish a violation of a constitutional or statutory right by the defendant or defendants. And should a plaintiff meet this burden to first establish a violation of a constitutional or statutory right, then the plaintiff is required to demonstrate that the right alleged to have been violated was clearly established at the time of the unlawful conduct asserted against the defendant.

7.  Should plaintiff fail to satisfy either part of this two-part inquiry, the Court must grant the defendants' qualified immunity.

8.  In this case, it appears after the fact that a U.S. citizen was taken off a commercial bus at a fixed border checkpoint, detained and sent back to Mexico, and it also appears that, at the time of the incident, plaintiff stated that he was not a U.S. citizen, and in his documents, there were discrepancies in terms of his identity.

9.  At a fixed border checkpoint, Border Patrol agents made a stop, briefly detained and questioned individuals without any individualized suspicion that the individuals are engaged in criminal activity.

10.     Plaintiff's departing the bus at the request of the Border Patrol agents is the equivalent to a motorist's secondary area at a fixed checkpoint.

11.     Whether the routine stop is conducted at a primary or a secondary checkpoint or both is irrelevant for Fourth Amendment concerns. The principal protection of the Fourth Amendment rights at checkpoints lies in the appropriate limitations on the scope of the stop. A routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area or both as long as the scope of the inquiry is appropriate.

12.     During a routine fixed checkpoint stop, Border Patrol agents may question individuals in the absence of individualized suspicion about their citizenship or immigration status and request documentation.

13.     Agents may question individuals concerning such things as citizenship, vehicle ownership, cargo, destination and travel plans as long as such questions are reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.

14.     Based on the undisputed facts as I have previously found, the plaintiff has failed to state a Fourth Amendment violation or state a statutory right that Defendant Weaver or Defendant Guardado violated. There was a mistake in sending plaintiff, a U.S. citizen, back to Mexico, but the Border Patrol agents' actions were lawful and reasonable considering the plaintiff's admission or considering the mistake or the discrepancy in the identification documents and plaintiff's admission that he was not a U.S. citizen.

15.     Defendants Weaver and Guardado are entitled to qualified immunity. Therefore, summary judgment is granted in favor of Defendants Weaver and Guardado in their individual

capacities based upon qualified immunity.

IT IS THEREFORE ORDERED that the Motion for Summary Judgment filed by Defendants Don Weaver, Jr., Raul Guardado, and Timothy Rhodes is hereby GRANTED, and that Counts II through VI of the Amended Complaint (Doc. 5) are dismissed with prejudice in their entirety.

It is so ordered this 10th day of June, 2002.

WILLIAM P. JOHNSON
United States District Court Judge

Submitted by:

DAVID C. IGLESIAS
United States Attorney

CYNTHIA L. WEISMAN
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
Tel. 505-346-7274

Approved as to form by:

KENNEDY & HAN

 Telephonic approval on 6/7/02 
Paul J. Kennedy
1122 Central Avenue S.W.
Albuquerque, New Mexico 87102
Tel:    505-842-8662

N:\CWeisman\Cases-New\Sandoval\court\opinion and order qi msj.wpd